Lionel Z. Glancy (#134180)
Peter A. Binkow (#173848)
Michael Goldberg (#188669)
Robert V. Prongay (#270796)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff Jun Yan*
*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Case No.: CV 12 4360

| | |
|---|---|
| JUN YAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) **CLASS ACTION COMPLAINT** |
| vs. | ) **FOR VIOLATIONS OF** ) **FEDERAL SECURITIES LAW** |
| ZYNGA INC., MARK PINCUS, DAVID M. WEHNER, JOHN SCHAPPERT, MARK VRANESH, REGINALD D. DAVIS, CADIR B. LEE, WILLIAM GORDON, REID HOFFMAN, JEFFREY KATZENBERG, STANLEY J. MERESMAN, SUNI PAUL, and OWEN VAN NATTA, | ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) |
| Defendants. | ) ) |

FILED BY FAX
PURSUANT TO LOCAL RULES

Plaintiff Jun Yan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Zynga, Inc. ("Zynga" or the "Company"), and the other defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, *inter alia*: (a) review and analysis of regulatory filings made by defendants with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by defendants; and (c) review of other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a Class Action brought on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired Zynga securities on the NASDAQ National Market System ("NASDAQ") (the "Class") during the period December 16, 2011 through July 25, 2012, inclusive (the "Class Period").

2.      This action, based on violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), arises out of a series of false and misleading statements and omissions of material facts made by Defendants regarding Zynga's business and prospects, including in Registration Statements and Prospectuses for the Company's initial public offering ("IPO"), as well as a secondary offering of their Class A common stock. Due to false statements by the defendants, Zynga's stock traded at artificially-inflated prices during the Class Period and reached a high of $14.69 per share on March 2, 2012.

## JURISDICTION AND VENUE

3.      This action arises under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated pursuant to section 10(b) by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. The jurisdiction of this Court is based on section 27 of the Exchange Act, 15 U.S.C. § 78aa; and on sections 1331 and 1337(a) of the Judicial Code, 28 U.S.C. §§ 1331, 1337(a).

4.     Venue is proper in this District under section 27 of the Exchange Act, 15 U.S.C. § 78aa, and section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b).  The corporate headquarters of Zynga are located in this District.

5.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of a national securities exchange.

## PARTIES

6.     Plaintiff, Jun Yan, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of Zynga stock at artificially inflated prices during the Class Period as set forth in the accompanying certification and has been damaged thereby.

7.     Defendant Zynga is a Delaware corporation headquartered at 699 Eight Street, San Francisco, California 94103.  Zynga was originally organized in April 2007 as a California limited liability company under the name Presidio Media LLC, converted to a Delaware corporation in October 2007, and changed its name to Zynga, Inc. in November 2010.  Zynga completed its initial public offering in December 2011 and its Class A common stock is traded on the NASDAQ Global Select Market, which is an efficient market, under the symbol "ZNGA."

8.     Mark Pincus founded Zynga in 2007 and at all relevant times served as Zynga's Chief Executive Officer and Chairman of Zynga's Board of Directors.  Defendant Pincus signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.  Defendant Pincus sold 16.5 million shares of Zynga Class A common stock during the Class Period for proceeds of approximately $200 million.

9.     Defendant David M. Wehner at all relevant times served as Zynga's Chief Financial Officer.  Defendant Wehner signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.  Defendant Wehner sold 386,865 shares of Zynga stock during the Class Period for proceeds of approximately $4.6 million.

10.     Defendant John Schappert at all relevant times served as Zynga's Chief Operating Officer and as a director of Zynga.  Defendant Schappert signed the Registration Statements in

CLASS ACTION COMPLAINT

2

connection with Zynga's IPO and Secondary Offering. Defendant Schappert sold 322,350 shares of Zynga stock during the Class Period for proceeds of approximately $3.9 million.

11. Defendant Mark Vranesh at all relevant times served as Zynga's Chief Accounting Officer. Defendant Vranesh signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Defendant Vranesh sold 366,216 shares of Zynga stock during the Class Period for proceeds of approximately $4.3 million.

12. Defendant Reginald D. Davis at all relevant times served as Zynga's Senior Vice President, General Counsel, and Secretary. Defendant Davis sold 314,643 shares of Zynga stock during the Class Period for proceeds of approximately $3.8 million.

13. Defendant Cadir B. Lee at all relevant times served as Zynga's Chief Technology Officer. Defendant Lee sold 1,172,000 shares of Zynga stock during the Class Period for proceeds of approximately $13.6 million.

14. Defendant William Gordon at all relevant times served as a director of Zynga. Defendant Gordon signed the Registrations Statements in connection with Zynga's IPO and Secondary Offering.

15. Defendant Reid Hoffman at all relevant times served as director of Zynga. Defendant Hoffman signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

16. Defendant Jeffrey Katzenberg at all relevant times served as a director of Zynga. Defendant Katzenberg signed the Registration Statement in connection with Zynga's IPO and Secondary Offering.

17. Defendant Stanley J. Meresman at all relevant times served as a director of Zynga. Defendant Meresman signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

18. Defendant Sunil Paul at all relevant times served as a director of Zynga. Defendant Paul signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

19.     Defendant Owen Van Natta at all relevant times served as a director of Zynga. Defendant Van Natta signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

20.     These defendants named in ¶¶ 8-19 above are referred to herein as the "Individual Defendants."

21.     The Individual Defendants, by reason of their management positions (including CFO, Executive VP of Worldwide Sales, President, CEO, Vice President of Business Development and Strategic Planning, and Audit Committee Financial Expert for the Company), membership on the Company's board of directors, and ownership of the Company's stock, were at all relevant times controlling persons of Zynga within the meaning of Section 20(a) of the Exchange Act.   The Individual Defendants had the power and influence to cause Zynga to engage in the unlawful acts and conduct alleged herein, and did exercise such power and influence.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons who purchased or otherwise acquired Zynga securities between December 16, 2011 and July 25, 2012, inclusive. Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; any entity in which any Defendant has or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any Defendant.

23.     As of April 13, 2009, over 37 million shares of common stock of Zynga were out-standing in an actively-traded and efficient market in which millions of shares were traded during the Class Period.   Zynga common stock is traded on the NASDAQ under the symbol "ZNGA."   The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to plaintiff, and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class.   Record owners and members of the Class may be identified from records

maintained by Zynga or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24. Plaintiff's claims are typical of the claims of the members of the Class in that plaintiff and each Class member purchased securities of Zynga during the Class Period and sustained injury as a result.

25. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

26. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to seek redress individually for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

27. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class:

a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) Whether Defendants acted willfully or recklessly in omitting to state and misrepresenting material facts;

c) Whether the Individual Defendants caused Zynga to issue false and misleading financial statements; and

d) Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

28. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

29.     Zynga develops, markets, and operates online social games as live services on the Internet, social networking sites, and mobile platforms.  The Company offers its games under the CityVille, Zynga Poker, FarmVille, CastleVille, FrontierVille, Mafia Wars, Words with Friends, Hidden Chronicles, Zynga Bingo, Scramble With Friends, Slingo, and Dream Heights names.  Its games are available on various platforms, including social networks and mobile platforms, such as Apple iOS and Google Android worldwide, but it relies most heavily on Facebook and its platform.

30.     On December 15, 2011, Zynga floated its initial public offering of 100,000,000 shares of Class A common stock at a price to the public of $10 per share on the NASDAQ Global Select Market.

31.     Pursuant to the Company's IPO Prospectus filed with the SEC on December 16, 2011, all officers and directors of the Company had entered into lock-up agreements which provided that they would not offer, sell or transfer any shares of common stock beneficially owned by them for 165 days, or until May 28, 2012.  The officers and directors of the Company also agreed with Morgan Stanley & Co. LLC and Goldman Sachs & Co. not to waive the lock-up restrictions without their prior consent.

Zynga Inc., Prospectus (Form 424B4) (Dec. 15, 2011).

32.     Big investors often take the opportunity to divest stock on the IPO.  The investing public noted favorably that Defendant Pincus, the Company's founder and CEO, would not be selling any of his personal shares of stock on the IPO.

## DEFENDANTS' MATERIALLY MISLEADING STATEMENTS AND OMISSIONS

33.    On December 15, 2011, Zynga issued a press release announcing that the IPO was being priced at $10.00 per share.

Press Release, Zynga Inc., *Zynga Inc. Prices Initial Public Offering* (Dec. 15, 2011) http://www.company.zynga.com.

34.    Also on December 15, 2011, the Company filed an Amended Form S-1 Registration Statement with the SEC concerning the Initial Public Offering of its Class A shares which made certain risk disclosures including the following:

> We are subject to Facebook's standard terms and conditions for application developers, which govern the promotion, distribution and operation of games and other applications on the Facebook platform. We have entered into an addendum to these terms and conditions pursuant to which we have agreed to use Facebook Credits, Facebook's proprietary payment method, as the primary means of payment within our games played through Facebook. This addendum expires in May 2015.

Zynga Inc., Amendment No. 9 to Form S-1 Registration Statement (Form S-1/A), at 14 (Dec. 15, 2011) ("Amended Form S-1") (emphasis added).

35.    Notwithstanding the above disclosure, the Amended Form S-1 failed to disclose that other agreements with Facebook, which could heavily affect Zynga's future bookings and revenue stream, were scheduled to expire on April 30, 2012.

36.    On February 14, 2012, the Company issued a press release which reported the following impressive results and an even more impressive outlook.   Specifically the 2012 outlook provided that:

> ●    Bookings are projected to be in the range of $1.35 billion to $1.45 billion. **We expect that growth will be weighted towards the back-half of the year with slower sequential growth in the first half of the year.** [emphasis added]

> ●    Adjusted EBITDA is projected to be in the range of $390 million to $440 million.

- Stock-based compensation expense is projected to be in the range of $400 million to $425 million excluding the impact of equity awards granted in connection with potential future acquisition.

- Capital expenditures are projected to be in the range of $140 million to $160 million. Our effective tax rate for non-GAAP net income is projected to be in the range of 20% to 25%.

- We project non-GAAP weighted-average diluted shares outstanding to be approximately 865 million shares in Q1 2012 and approximately 890 million shares in Q4 2012. Full year 2012 non-GAAP EPA is projected to be in the range of $0.24 to $0.28.

Press Release, Zynga, Inc., *Zynga Reports Fourth Quarter and Full Year 2011 Financial Results* (Feb. 14, 2012), http://www.investor.zynga.com/releaseddetail.cfm?ReleaseID=648577 ("Feb. 14, 2012 Press Release").

37. Concerning the Company's results and future prospects, Defendant Pincus stated,

2011 was another milestone year for Zynga's mission of connecting the world through games. We are seeing social games and more broadly play become one of the most popular pastimes on web and mobile. Zynga set new records in the year in terms of audience size, revenues and bookings. We saw great momentum in mobile and advertising and ended the year with a strong pipeline of new games. We are excited about the opportunities in front of us to continue delighting our current players and to bring play to millions of new people.

Feb. 14, 2012 Press Release.

38. On February 28, 2012, the Company filed a Form 10-K with the SEC for the fiscal year ended December 31, 2011 which, unlike the Amended Form S-1 filed on December 15, 2011, made the following disclosure, in pertinent part:

Future bookings and revenue may be negatively impacted if our current game card program is not extended beyond April 30, 2012. Our contract with Facebook allows us to continue to distribute our game cards until April 30, 2012.

CLASS ACTION COMPLAINT

8

Zynga Inc., Annual Report (Form 10-K) at 8 (Feb. 28, 2012) ("Feb. 28, 2012 Annual Report").

39.     In addition, the section entitled Management's Discussion and analysis of Financial Condition and Results of Operations contained the following statement:

> We made significant investments in 2011 to drive long-term growth. We continue to invest in game development, creating both new games and new features and content in existing games designed to engage our players. We are also investing in other key areas of our business, including international market development, mobile games and our technology infrastructure.   In 2012, we expect to make capital expenditures of up to $160 million as we invest in network infrastructure to support our expected growth and to continue to improve the player experience.

Feb. 28, 2012 Annual Report, at 34.

40.     The February 14 and February 28 statements are misleading in that they paint an overly optimistic picture of the Company's growth prospects for the future.   More importantly, the statements misleadingly emphasize that growth would be weighted towards the back-half of the year with slower sequential growth in the first half of 2012.

41.     As a result of the Company's financial results, statements, and guidance, Zynga stock closed at an all-time high of $14.69 on March 2, 2012.

42.     Conveniently, on March 14, 2012, the Company issued a press release stating that it had "filed a registration statement with the U.S. Securities and Exchange Commission (the "SEC") for certain stockholders of Zynga Inc. to offer shares of Class A common stock." Press Release, Zynga Inc., *Zynga Files Registration Statement For Proposed Secondary Offering* (March 14, 2012), http://www.investor.zynga.com/releasedetail.cfm?ReleaseID=657142.

43.     The press release stated that Zynga would not receive any proceeds from the sale of the shares and misleadingly explained that the principal purpose of the offering was to "facilitate an orderly distribution of shares and to increase the company's public float." March 14, 2012 Press Release.

44.   The "orderly distribution of shares" offered by "certain stockholders" was referring to the liquidating of over 49 million Class A common shares of Zynga held by Company insiders, representing almost 50% of the amount sold in its IPO.   However, the investing public had no indication of the magnitude of sales by Company insiders because they were subject to the previously described lock-up agreements which would not expire until May 28, 2012.

Zynga Inc., Form S-1 Registration Statement (Form S-1), at 40 (March 14, 2012) (emphasis added).

45.   According to Management's Discussion and Analysis of Financial Condition and Results of Operations" contained within the Prospectus filed March 14, 2012:

> **We made significant investments in 2011 to drive long-term growth.** We continue to invest in game development, creating both new games and new features and content in existing games designed to engage our players.   We are also investing in other key areas of our business, including international market development, mobile games and our technology infrastructure.    In 2012, **we expect to make capital expenditures of up to $160 million as we invest in network infrastructure to support our expected growth** and to continue to improve the player experience.

46.   On March 23, 2012, the Company filed an Amendment No. 1 to Form S-1 Registration Statement.   The Amended Form S-1 stated, "[w]e are releasing the selling stockholders from these lock-ups to permit them to sell up to 49,414,526 shares (including the underwriters' option to purchase additional shares) in this offering." Zynga Inc. Amendment No. 1 to Form S-1 Registration Statement (Form S-1/A), at 29 (March 23, 2012.)

47.   As a result, Company insiders would be able to liquidate their personal shares which they would have had to have held until May 28, 2012, under the lock-up agreements.

48.     The May 28, 2012 lock-up date would have been very inconvenient for insiders. In fact, Zynga stock closed at a price of $6.09 per share on May 29, 2012, almost 50% lower than the Secondary Officering price of $12, which was consummated on April 3, 2012.

49.     On April 12, 2012, Zynga stock closed at $12.13 per share. It would be the last time to date that the Company's stock would close at level of higher than $12 per share.

50.     Nonetheless, Company insiders were able to liquidate over $500 million dollars of personal shares in Zynga prior to releasing the first quarter financial results, while public shareholders began amassing huge losses.

51.     On April 26, 2012, Zynga issued a press release in connection with its First Quarter 2012 Financial results.  The results were not impressive compared to the previous tremendous growth that the Company had experienced.

52.     In fact, while year-over-year quarterly bookings and revenue were up, adjusted EBITDA, non-GAAP net income, non-GAAP earnings per share, net income, and diluted net income per share were all down.

53.     Nonetheless, Defendant Pincus stated,

> We're pleased with the progress that Zynga has made in the first quarter growing our audience reach 25% year over year and nearly 20% quarter over quarter.  Our team did a great job launching 5 new games across mobile and web including new hits like *Hidden Chronicles*, *Slingo* and *Scrambe with Friends* . . .

Press Release, Zyga Inc., *Zynga Reports First Quarter 2012 Financial Results* (April 26, 2012), http://www.investor.zynga.com/releasedetail.cfm?ReleaseID=667869.  (April 26, 2012 Press Release).

54.     The press release again misleadingly stated that the "principal purposes of the offering were to facilitate an orderly distribution of shares and to increase the company's public float."
April 26, 2012 Press Release.

55.     This statement is false and misleading because the primary purpose of the offering was, in actuality, to allow Zynga insiders to liquidate their shares at inflated prices.

56.     Surprisingly, notwithstanding the slowing growth in Zynga's business, the Company actually raised its 2012 Guidance in the same press release:

> As of today, we're updating our outlook for 2012 as follows:
>
> •     Bookings are projected to be in the range of $1.425 billion to $1.5 billion.  We expect that.
>
> •     Adjusted EBITDA is projected to be in the range of $400 million to $450 million.
>
> •     Stock-based expense is projected to be in the range of $420 million to $445 million excluding the impact of equity awards that may be granted in connection with potential future acquisitions.
>
> •     Capital expenditures are projected to be in the range of $390 million to $410 million which includes the purchase of our corporate headquarters building in April 2012.
>
> •     Our effective tax rate for non-GAAP net income is projected to be in the range of 25% to 30%.
>
> •     Full year 2012 non-GAAP EPS is projected to be in the range of $0.23 to $0.29.

April 26, 2012 Press Release.

57.     The increased guidance for 2012 seemingly justified the insider sale of stock at levels elevated from the original IPO price of $10 per share.

58.     Similar to the 2012 Outlook presented in its February 14, 2012 press release, the 2012 Outlook provided in the April 26, 2012 press release emphasized that growth would be "weighted towards the second half of the year with slower sequential growth in the first half of the year."

59.   During the Q1 Earnings Call, in response to a question from an analyst concerning the Company's growth outlook, Defendant Schappert said, "I think we're just saying that the sequential growth rates will be higher in the back two quarters than in the second quarter." Zynga Inc., Q1 2012 Earnings Call Transcript (April 16, 2012), www.morningstar.com/earnings/PrintTranscript.aspx?id=40023688 ("Q1 April 26, 2012 Earnings Call").

60.   On the same call, Defendants continued to set forth a falsely optimistic picture of Zynga's growth prospects. Defendant Pincus represented that, "I think that we remain still underpenetrated on the Facebook platform for web and PC." Defendant Schappert stated, "[w]e [ ] continue to see FarmVille performing well, and we see good prospects for Farmville and our existing games and new games for the remainder of the year, which is why we're excited and comfortable raising guidance for the year."

Q1 April 26, 2012 Earnings Call.

61.   During that same conference call, Defendant Wehner stated the following, in relevant part:

> In addition to bookings growth in terms of games, I wanted to talk about bookings growth by platform, both web and mobile. We saw growth in both web and mobile bookings on a year-over-year and quarter-over-quarter basis. Mark and John talked about the rapid mobile audience growth we've experienced, but mobile is not just driving audience growth, it is also driving bookings growth. In the first quarter, the majority of our bookings growth came from our mobile games on both a year-over-year and quarter-over-quarter basis. We're very pleased with the strength from our mobile games.
>
> * * *
>
> Let me now turn to guidance. We're well positioned for growth in 2012. Our business continues to track well against the original guidance we gave in February. And we're increasing bookings guidance today to reflect the recent acquisition of OMGPOP. Note, however, that we continue to expect growth to be weighted towards the second half of the year.

CLASS ACTION COMPLAINT
13

For the full year 2012, we expect to deliver bookings between $1,425 billion and $1.5 billion, with adjusted EBITDA between $400 million and $450 million.  We've increased adjusted EBITDA to reflect bookings, partially offset by increases in both sales and marketing and R&D.

* * *

We expect our effective tax rate for non-GAAP net income to between 25% and 30%, an increase above our previous 20% to 25% range due to a change in our expected geographic earnings mix.  And finally, we expect non-GAAP EPS to be between $0 23and $0.29 per share.

62.     The above statements were materially misleading (and failed to disclose material facts) in that the Company's business was already heavily dependent on the Facebook platform, it knew that growth in its existing games was slowing down at the time, and it knew it was experiencing delays in launching new games.

## THE TRUTH EMERGES

63.     On July 25, 2012, Zynga issued a press release in connection with its Second Quarter 2012 Financial Results, which were much lower than expected.  Press Release, Zynga Inc., *Zynga Reports Second Quarter 2012 Financial Results* (July 25, 2012), http://www.investor.zynga.com/releasedetail.cfm?ReleaseID=695419 ("July 25, 2012 Press Release").

64.     Year-over-year quarterly earnings per share dropped from $0.05 per share to $0.01 per share and net income.  The Company also reported a net loss of over $22.8 million.

65.     In the press release, the Company also lowered its earnings guidance dramatically, after having raised its guidance only one quarter previously, stating:

We are lowering our outlook to reflect delays in launching new games, a faster decline in existing web games due in part to a more challenging environment on the Facebook web platform, and reduced expectations for Draw Something.  As a result, our updated outlook for 2012 is as follows (emphasis added):

• Bookings are projected to be in the range of $1.15 billion to $1.225 billion.

- Adjusted EBITDA is projected to be in the range of $180 million to $250 million.

- Stock-based expense is projected to be in the range of $410 million to $430 million.

- Capital expenditures are projected to be in the range of $370 million to $380 million, which includes the purchase of our corporate headquarters building in April 2012.

- Our effective tax rate for non-GAAP net income is projected to be in the range of 50% to 60%.

- Non-GAAP weighted-average diluted shares outstanding are projected to be approximately 845 million shares in the fourth quarter of 2012.

- Full year 2012 non-GAAP EPS is projected to be in the range of $0.04 to $0.09.

July 25, 2012 Press Release.

66.     Inexplicably the new outlook was not only below the misleading optimistic outlook presented in the first quarter earnings press release, but also it was below the guidance provided in the 2011 year end earnings press release.

67.     The lowered guidance at the end of the second quarter completely contradicted the Company's previous repeated assertions that growth would "be higher in the back two quarters than in the second quarter."

68.     The "faster decline in existing web games" was in complete contradiction to Defendant Schappert's statement on the Q1 conference call that, "we see good prospects for Farmville and our existing games."

69.     The "more challenging environment on the Facebook web platform" was in complete contradiction to the Q1 conference call statement by Defendant Pincus, which indicated that Zynga was still underpenetrated on the Facebook platform for web and PC."

*See* Q1 April 26, 2012 Earnings Call.

70.    In sum, prior to its July 25, 2012 press release, Zynga materially misrepresented and failed to disclose the true financial and business prospects for the Company.

71.    During the Second Quarter 2012 Results Conference Call, Richard Greenfield, an analyst for BTIG, posed the following question (or expression or disbelief) in response to the surprisingly poor second quarter financial results and dramatically lowered outlook:

> I'd also love to get your sense, you sold stock, I think, on March 28 at $12 a share. The company raised guidance in late April when you reported the first quarter, and now you've cut guidance by a pretty large amount. Just you didn't pre-announce; is there any reason for not pre-announcing and just how do you react, or how should we react to this?

Zynga   Inc.,   Q2   Second   Quarter   2012   Results   Conference   Call   (July   25,   2012), http://www.investor.zynga.com/events.cfm ("Q2 July 25, 2012 Results Conference Call").

72.    Apparently Richard Greenfield was not the only analyst who got caught off guard as a result of Defendants' misleading statements and omissions.  Many, if not most, analysts reduced their price targets by over 50% upon the disclosure of the Company's true financial prospects.

73.    The following is a list of several equity analysts and their changes in price targets as a result of the truth being disclosed on July 25, 2012:

| **Firm** | **Analyst** | **Previous Target** | **New Target** |
| --- | --- | --- | --- |
| Goldman Sachs | Heath Terry | 6/14/12 - $13 | 7/26/12 - $4 |
| Robert W. Baird | Colin Sebastian | 7/18/12 - $13 | 7/26/12 - $6 |
| BMO Capital | Edward William | 7/19/12 - $10 | 7/26/12 - $5 |
| Barclays | Mark May | 6/18/12 - $8 | 7/16/12 - $3 |

74.    The day after the announcement, Zynga stock closed at $3.175 per share, a decline of close to 40% from the previous trading day.  It should also be noted that this represents a 68% decline from the IPO price only seven months previous to the announcement.

75.     More importantly, it represents a 73% discount to the Secondary Offering price of $12, at which Zynga insiders successfully sold over $500 million of their personal Zynga shares; the Individual Defendants' "pump and dump" scheme had worked according to plan. A chosen few insiders were able to sell at artificially inflated prices, while individual investors and lower level Zynga employees were left holding the bag.

76.     Assisting the Individual Defendants in their scheme were the underwriters, led by Goldman Sachs and Morgan Stanley, who were complicit in modifying the Individual Defendants' lock-up agreements while collecting over $15 million in fees for the Secondary Offering alone.

## FRAUD-ON-THE-MARKET DOCTRINE

77.     At all relevant times, the market for Zynga's common stock was an efficient market for the following reasons, among others:

(a) The Company's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Zynga filed periodic public reports with the SEC and the NASDAQ;

(c) Zynga regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Zynga was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available

sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

79.     Zynga's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

80.     During the Class Period, Plaintiff and the Class purchased Zynga securities at artificially inflated prices and were damaged thereby.   The price of the Zynga's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

81.     As alleged herein, defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

### COUNT I
### PURSUANT TO SECTION 10(b) OF THE EXCHANGE ACT AND
### RULE 10b-5 PROMULGATED THEREUNDER
### (Against All Defendants)

82.     Plaintiff incorporates by reference the allegations of the above paragraphs herein as if fully set forth herein.

83.     The reported financial results of Zynga were materially false and misleading, and Defendants knew or were reckless in not knowing they were so, because Defendants prepared

and participated in the issuance of the deceptive and materially false and misleading statements to the investing public, as set forth above.

84. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct in an effort to maintain artificially high market prices for Zynga securities in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

85. As a result of the dissemination of the aforesaid false and misleading reports, releases, and statements the market price of the securities of Zynga throughout the Class Period was higher than it would have been had the true facts concerning the Company's financial condition been known by the market.

86. In ignorance of the artificially high market prices of Zynga's publicly traded securities, and relying upon the integrity of the market in which that stock was traded, Plaintiff and the other members of the Class acquired Zynga securities during the Class Period at artificially inflated prices and were unable to recover this inflation after the truth began to be revealed, and were damaged thereby.

## COUNT II
### PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Individual Defendants)

87. Plaintiff incorporates by reference the allegations of the above paragraphs herein as if fully set forth herein.

88. This claim is asserted against the Individual Defendants and is based on section 20(a) of the Exchange Act. Individual Defendants acted as controlling persons of Zynga within the meaning of section 20(a) of the Exchange Act. By reason of their positions as officers and directors of Zynga and ownership of Zynga stock, Individual Defendants had the power and authority to cause or to prevent the wrongful conduct described herein and did exercise such power and authority.

89.   By reason of the foregoing, Individual Defendants are liable jointly and severally with and to the same extent as Zynga for Zynga's violations of section 10(b) of the Exchange Act and Rule 10b-5.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff, on behalf of herself and the Class, prays for judgment as follows:

i)   Declaring this action to be a proper plaintiff class action maintainable pursuant to rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring plaintiff to be a proper representative of the Class.

ii)   Awarding plaintiff and all of the other members of the Class damages in an amount to be proven at trial, together with prejudgment interest thereon;

iii)   Awarding plaintiff the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

iv)   Granting plaintiff and the other members of the Class such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:   August 17, 2012

**GLANCY, BINKOW & GOLDBERG LLP**

By: _____

Lionel Z. Glancy
Peter A. Binkow
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**MURRAY FRANK LLP**
Brian P. Murray
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone:  (212) 682-1818
Facsimile:  (212) 682-1892

*Attorneys for Plaintiff*
*And the Proposed Class*

## PLAINTIFF'S CERTIFICATION

I, Jun Yan, do hereby certify that:

1. I have reviewed the complaint and have authorized its filing.

2. I purchased securities of Zynga, Inc., which are the subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the three year period prior to the date of this certification, I have sought to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions:

*Yan v. Nasdaqomx Group, Inc. et al*

5. During the Class Period, I engaged in the following transactions in Zynga securities that are the subject of this action:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SECURITIES | PRICE PER SECURITY |
|---|---|---|---|
| BUY | 04/27/2012 | 700 | $ 8.55 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on __8/16__ 2012.     Completed by (Print Name): ___JUN YAN___


Signature: ___Yan___